319-55 City of Peoria, accounting by Kevin Day v. The Firefighters' Pension Fund of the City of Peoria, accolade by Brian Mulberry and Angela Allen, accolade by Jack Swansfield. May it please the Court. Counsel. Kevin Day on behalf of the City of Peoria. Ms. Allen was awarded a line of duties disability pension by a vote of 3-2 of the Pension Board for a condition she didn't allege in her application for benefits, has denied having, and has refused treatment for. Support for these conclusions can be found throughout the appellate record, but specifically pages 1811-1821, pages 2940-2941, and pages 3649, 4701, and 3713. The record before this Court establishes Ms. Allen failed to meet her burden of establishing she is permanently disabled from her employment with the City of Peoria as a result of the July 2015 accident. This conclusion is supported by Ms. Allen's medical records, the independent medical examination reports at issue, the relevant testimony, and the Pension Board's own decision on this matter. The City of Peoria respectfully requests that this Court enter into order denying Ms. Allen's application for line of duty disability pension pursuant to Supreme Court Rule 366-A-5. Alternatively, the City of Peoria requests that this Court remain the matter back to the Pension Board for entry of a decision denying Ms. Allen's pension application. On appeal, the City of Peoria presents two central arguments. First, the Pension Board erred by awarding Ms. Allen a line of duty disability pension for an alleged condition that could have been resolved by safe, reasonable treatment that was recommended by multiple physicians in this matter. That treatment also offered a reasonable prospect of relief. Secondly, the City argues Ms. Allen failed to meet her burden of establishing a permanent disability under the pension code as a result of the July 2015 injury. As I stated at the outset, Ms. Allen solely applied for a line of duty disability pension based on an alleged vestibular ocular motor disorder she sustained as a result of the July accident. The record before this Court does not support Ms. Allen's claim for a line of duty disability pension on that basis. This fact was expressly acknowledged by the Pension Board and is apparent from the Pension Board's own decision. The three physicians utilized by the Pension Board, Dr. Dinwiddie, Dr. Kessler, and Dr. Brooke, performed examinations on Ms. Allen and unanimously found that she neither suffered from that disorder nor was disabled by any such condition. However, rather than deny Ms. Allen benefits, the Pension Board granted Ms. Allen a line of duty disability pension based on a psychological disability that, as I stated, she is denied having multiple times and she has specifically refused treatment for on multiple occasions. The City of Peoria maintains Ms. Allen is not physically or psychologically disabled from returning her to her employment. Additionally, we would allege that any disabling condition is not caused by the July accident. However, even if this Court finds sufficient evidence of the work-related psychological condition claimed by the Pension Board, Ms. Allen is not permanently disabled under the Pension Code. This issue should be reviewed under the de novo standard. This inquiry involves an interpretation of the Pension Code, which the Mollack and Carmody decisions would indicate should be reviewed de novo. Additionally, the bulk of the record on appeal here is documentary in nature, and this Court can review those documentary pieces of evidence under the de novo standard. This is supported by the Wilford decision. The documentary evidence that I referred to consists of extensive medical records, taking up thousands of pages of this appellate record, six IMA reports, which this Court can review de novo, and Ms. Allen's application for a line of duty disability documents and supported documents. Ultimately, the Pension Board erred as a matter of law by interpreting permanent disability under the Pension Code to include a condition that can be remedied without significant danger to life or health, which multiple positions have opined offers a reasonable prospect for relief. This is contrary to the established law and contrary to the case law. Both the City of Peoria and the Pension Board acknowledge the Mollack exception applies in this matter. This is an exception from the general disability rule that the Pension Code should be construed to exclude medical conditions, which I have discussed. There is reasonable treatment available, it's safe, and it offers a prospect of relief. That did not happen. The Board's decision makes no reference to Section 4-105, the statutory definition of permanent disability, or the common law definition of the phrase. The decision also fails to make any finding regarding the availability of medical treatment, the safety or reasonableness of any available medical treatment, or whether any available medical treatment presented a reasonable prospect of relief. These omissions highlight the Board's error as a matter of law. Had the Board correctly interpreted permanent disability underneath the statute, it would have found that Dr. Nagel, Dr. Dinwiddie, and Dr. Brook opined safe, reasonable treatment was available, which offered a prospect for relief. This treatment was further recommended by Dr. Jankowski, and in the interest of time to refrain from citing it to my brief, I would direct the Court's attention specifically to pages 11 and 12, where I discuss quotes of those specific doctors relating to the availability of that treatment, its reasonable and safe nature, and the fact that Ms. Allen had a prospect of recovery should she pursue that. The Pension Board's failure to adhere to that rule of law is error as a matter of law and should be reversed by this Court. I would submit that the Court can reverse the Pension Board's decision on that basis alone. However, secondly, Ms. Allen also failed to meet her burden of establishing she is disabled from returning to her employment and that that disability is causally related to her accident. Regardless of the standard of review applied by this Court, Ms. Allen ultimately bears the burden of proving the existence of her physical or mental disability, that that physical or mental disability has rendered her disabled, and that it was a result of an act of duty. The record before this Court establishes Ms. Allen has not and cannot meet her burden under the Illinois Pension Code. The Board argues the opinions of Dr. Dinwiddie, Dr. Brook, Dr. Glantz, Dr. Mahoney, and Dr. Fletcher found Ms. Allen disabled. However, none of these physicians found her disabled as a result of the vestibular oculomotor disorder she applied for. The reports of Dr. Dinwiddie, Dr. Brook, and Dr. Glantz are mischaracterized by the Board not only in their opinion in this matter, but also in their briefs. These reports actually negate any claim Ms. Allen has that she is disabled under the Pension Code. Further, the Board, in its decision, fails to explain or discredit the strong opinion of Dr. Kessler, which I feel should have been given substantial weight in this matter, and this Court, under de novo review of that documentary piece of evidence, should give strong weight. Dr. Kessler clearly and emphatically stated Ms. Allen is capable of returning to her employment. The medical records before this Court establish Ms. Allen did not sustain a concussion, any type of neurologic injury, any type of vestibular injury as a result of the July accident. To sum up the arguments raised in our briefs, Ms. Allen's medical records unequivocally established the following conclusions. One, Ms. Allen's injury histories are consistent with prior statements, and they're just in whole wildly inconsistent from one to another. She failed to complain of any head trauma, concussive symptoms, or vestibular injury until 12 days after the accident, despite reporting to the emergency room two days afterwards and failing to report any of the symptoms she later claimed to have developed. Her lack of symptoms at the time of the alleged incident negate her later claim of injury. This progression of symptoms is also inconsistent with any concussion or neurologic vestibular injury, and this is unanimously upheld and affirmed by the IME physicians in this matter. They all routinely said that her development of an alleged traumatic brain injury is contradictory to the established medical literature in the development of these types of conditions. Her subjective symptoms throughout this matter, as evidenced by the appellate record, are also grossly out of proportion to her objective findings. And lastly, Ms. Allen's alleged symptoms could not have been caused by the work accident. The Board fails to address these glaring medical record issues or explain how these records are consistent with the ultimate findings in this matter. The Board further fails to reference, explain, or present argument regarding Ms. Allen's highly questionable and unsubstantiated assertion that she damaged her fire helmet as a result of the fall. At the time of the pension hearing, Ms. Allen testified that she slipped on one of these stairs, fell backwards, saw her feet fly up from under her, landed on her back, and that's all that she remembered. And this is years after the initial accident. However, the medical records provide detailed analysis and depiction of the accident that she has claimed. Those records indicate that she slipped backwards, as she said, feet flew out in front of her, she landed on her Scott air pack, the air pack the firefighters wear on the back, and then she slid down approximately eight to ten stairs. These are her own words. It's very descriptive. She also indicates that her right arm flew out from under her and made contact with one of the railings, causing a neurologic injury to her arm. However, there's never a mention of hitting her head. And I'm not here to say that a concussive type injury cannot be sustained with, you know, out of direct blow to the head. However, at the pension hearing, a helmet was produced. This helmet had a substantial dent in the front of Ms. Allen's helmet. Ms. Allen had possession of that. There are pictures admitted into evidence in this matter. She testified she never fell forward. She testified and reported that she fell on her back. It's also significant to note that when she came down at the base of the stairs, she then spoke with her battalion chief. She testified that the battalion chief made no reference whatsoever to a significant dent in the front of her helmet. Now then, she says that this purportedly, this dent proves that she sustained an injury. I feel like that testimony, the highly questionable circumstances, and her inconsistent prior statements, which again, documentary in nature that this court can review de novo, indicate that her testimony and the fact that she has testified in this case that she sustained an accident, should be called into question by this court. Counsel, your two minutes. Thank you. A complete review of Ms. Allen's medical records, injury reports, and the medical reports in this matter support the conclusion that she did not sustain a concussion, any type of neurologic injury, vestibular injury, or psychological injury. Thank you. Just briefly, I would like to point out a few other inconsistencies with the pension board's decision and their representations of some of the doctors. Dr. Glantz, upon Ms. Allen, was disabled and unable to fulfill her work duties. However, he gave his opinion on October 9th of 2015. He also expressly indicated Ms. Allen would complete her recovery within approximately two months. His opinion should be afforded little weight as it is far removed from the pension board hearing and further does not address the conditions that have been alleged. I would also direct the court to the testimony of the physician Ms. Allen produced at the pension hearing. He indicated that he felt she had a psychological condition as a result of the fall. However, he also indicated he thinks that additional treatment was available to her and she should have availed herself to that treatment. I would also ask you to carefully look over the testimony of the employee that she called Mr. Yang. Mr. Yang put Ms. Allen through a course of tests at the fire training center. He indicated that she had no difficulty performing the tests that he asked her to do. He was told that if he found her to be disabled, he would need to author a report and provide that to his superiors. He never authored that report. He testified that he had no concerns regarding Ms. Allen's ability to return to work. In conclusion, based on the foregoing arguments and the record before this court, the pension board's decision should be reversed by this court regardless of the standard of review applied on appeal. The facts and law relevant to this case establishing Ms. Allen failed to meet her burden of proving she's entitled to a line-of-duty disability pension under the pension code. I would rely on my briefs for any arguments not raised here before the court this morning, and the City of Peoria would respectfully request this court reverse the pension board's decision and deny Ms. Allen's application in accordance with Supreme Court Rule 366. Alternatively, as I stated at the outset, I would request that this court remand this matter back to the pension board for entry of an order denying her application. I'd be happy to address any questions at this time. If there's none, thank you very much. Thank you. Barry, you're going to take eight minutes. Ms. Burns is going to take seven minutes. That's correct, Judge, yes. May it please the court, counsels, my name is Brian Labardi, and I represent the Firefighters' Pension Fund of the City of Peoria in this matter. The first thing I'd like to note is it's important to know the nature of the injury in this case. There's no question that Firefighter Allen, Captain Allen, fell down the stairs at an active fire scene while pulling fire hose. That's something that wasn't brought up during the City's argument, that she was injured during an active fire performing duty as a firefighter. We certainly disagree on the standard of review to be applied to this matter. As you heard from the City, they argued that the noble standard of review applies. Our brief sets forth why the manifest wit of the evidence standard is the proper standard to apply. Simply because you're reviewing documentary evidence, again, this isn't solely a documents case. There were three hearings held before the pension board. There was plenty of live testimony heard before the pension board, including medical live testimony that was heard before the pension board. So it isn't solely a documents case. But even to the extent it were, if you look to the Illinois Supreme Court case of Wade, where they had a situation where it was a documentary review of an IME doctor, the court there applied the manifest wit of the evidence standard. Moreover, in looking at the Rozak case, which is a case from this district that deals with the treatment available to a disability applicant, they specifically find, quote, the board's decision will be reversed only if it was against the manifest wit of the evidence. And that's Rozak at page 139. That case is directly on point in terms of the standard of review. In addition, we talked about the definition, the statutory definition, under section 4105B of the pension code, which is permanent disability. So in this case, what the parties are asking you to do is apply the facts to that statute. In the alternative, that would be a mixed question of law and facts, subject to clearly erroneous standard of review. But it is important to note the definition under 4105B, which, unlike the police code section 3, which is the Rozak case is a police case, has a different definition which says, any physical or mental disability that can be expected to result in death, not at issue here, or has lasted for a continuous period of not less than 12 months or can be expected to last for a continuous period of not less than 12 months. If you look at the IME reports, several of the doctor's reports all say she has suffered from this disability for a period of longer than 12 months. Regardless of whether or not she needs to avail herself of additional treatment, at the time the hearing was held before the pension board in this matter, she had satisfied the statutory definition of permanent disability because her disability had lasted for a period of greater than 12 months. What the city is asking you to do is essentially reweigh the evidence that was heard before the pension board. And it was a voluminous record, as the Court is aware. But there is not just sufficient, significant amounts of evidence in the record that support the pension board's decision. By my count, I have five doctors, Dinwiddie, Brook, Glantz, Mahoney, and Fletcher, who found the applicant disabled. Of those doctors... What was the nature of the disability? The nature of the disability was somatic disorder, which is a psychological disability. The idea that we've talked about this falling and the dented helmet, I would submit, Your Honor, is a red herring. There's no question that she fell. Nobody disputes that. Doctors Brook, Mahoney, Fitch, and Fletcher also attributed her disability to the fire response at issue. So whether she fell forward or fell backward, or her helmet was dented or wasn't, there are at least four doctors in the record that attribute her psychological disability to the fire response incident that's at issue. Can you speak to the divergence of the application, the condition listed in the application, and the condition that I view as a hybrid condition? It's a physical injury that resulted in medical or mental consequences. It's a misbelief that there's pain. I mean, there are mental issues such as anxiety, and she doesn't have those. It's a hybrid of mental issue resulting from physical injury. Not being a doctor, Your Honor, I think that you summarize the condition very well, that that's a very fair representation of what her condition is. I'm interested in the argument of the opposing counsel that says, well, you know, you get what you applied for, and you didn't apply for somatic injury. I don't agree with the position that you get what you apply for. She did not apply for a somatic injury, and the nature of this injury is such that it takes quite a while for a diagnosis of a somatic injury to develop, which is what happened in this case. And furthermore, I would suggest that the case law says that any evidence in the record that supports the Board's decision is sufficient to affirm the Board's decision, and there is plenty of evidence in the record that the applicant is disabled from the somatic disorder. So whether she applied for it or didn't apply for it, there's plenty of medical evidence in the record that says she has it, and it's a result of the fire response, which is sufficient, I would submit, to support the Board's decision. There's no evidence that it was preexisting. There is not. Even after the accident. That's correct, Your Honor, yes. Moving specifically briefly to the doctors, there was also some discussion about whether or not a concussion occurred at the fire scene. Again, I would submit this is somewhat of a red herring, because the doctors do agree she was disabled as a result of the fall. But I would like to point out that Dr. Mahoney, on the record at page 3096, did say it seems more likely than not that Ms. Allen did suffer a mild concussion at the time of her injury, which resulted in a lingering and slowly recovering neurocognitive disorder. So there is evidence in the record that says that she may have had a concussion. There's evidence that says she didn't, but that's why the Pension Board sits as a trier of fact.  Can the somatic response occur without a concussion? What was the medical evidence? Is a concussion a precursor? I don't know, Your Honor, whether or not that is a requirement of a somatic disorder or not. I don't believe that it is. Was there any testimony regarding that in the record? I don't recall off the top of my head, Your Honor. I'm sorry. In addition to that, Dr. Mahoney specifically linked the disorder to the July 18th of 2015 fire response, as did Dr. Brook and as did Dr. Fletcher. Now, briefly, as to the issue of whether or not she's required to avail herself of treatment, again, the statutory definition says it has to be a condition that lasted from 1 to 12 months. She's met that burden in this matter. However, the burden, I would suggest, is higher than whether or not the treatment is safe and effective and may have helped. Again, going to the Rozic case, which is from this district, 2007, this Court in that case said, absent proof that the firefighter would have fully recovered if he had all recommended treatment, his refusal does not justify reduction in benefits under the code. There is a difference of opinion in the record as to whether or not the treatment for the somatic disorder would have allowed her to return to full and unrestricted firefighting duties. Many of the opinions say this is a very new disorder. There's not a lot of research on it. We aren't clear how much treatment would help. Treatment may help, but there are opinions in the record that suggest that that does not allow her to return to full and unrestricted duty as a firefighter. For example, Dr. Dinwiddie, who was one of the pension board physicians, said, this disability is unlikely to resolve rapidly, i.e., in a period of less than one year, even with effective treatment. So again, we have that one-year milestone there as well. So Dr. Dinwiddie was of the opinion that even if she sought treatment, we don't know whether she would be able to return, and it would take more than a year, which makes her permanently disabled by definition contained in the statute. Thank you. In addition to that, Your Honor, the Rozak case relied heavily on the Lucchese case, which is a First District case from 2002. Both these cases were decided subsequent to the Mullack case that the city primarily relies on. And the thing I would like to leave you from the Lucchese case is that in that case, the court found that the board, the pension board, had heard no evidence that the refusal to receive physical therapy, in that case it was a shoulder injury, was the sole cause of continuing disability. So in this case, there is no evidence that she would have fully recovered had she sought the treatment, and there is no evidence that her continued disability results solely from her failure to seek treatment. It can be a combination of factors. The injury that occurred at the fire scene and the subsequent disability and her failure to seek treatment still makes her disabled under the pension code. The Lucchese case would only have that disqualify her in the event her failure to seek treatment were the sole reason she remains disabled, and that is not supported by the record. I'm happy to answer any questions that the Justices may have. But for these reasons, we would ask that you affirm the decision of the circuit court, which affirmed the decision of the pension board. Thank you. Thank you, Mr. O'Leary. Ms. Bernstein. Your Honor, allow me to appear before you, please, counsel and Ms. Port. My co-counsel, in a manner of speaking, addressed this probably better than I could. But to start, with regards to what this court is to review, I have made the arguments that my opposing counsel has made, and I have lost many times on those, which is that it does not matter how the board explains their decision. It does not matter if they articulate everything correctly. What matters is if there's enough evidence to support the record below and their decision. In this case, the manifest weight of the evidence applies. Yes, you can review the documents de novo. However, there was live testimony, both by my client and by Dr. Fletcher, which you can't review live here because they're not here again today. And they're not asking you, really, to just look at the different evidence and see if there's sufficient standard. Opposing counsel asked you to give Dr. Kessler's opinion substantial weight. They're asking you to re-weight the evidence, and that is inappropriate for what we're here to do today. I wonder whose argument the de novo applies to. The documentary, yes. Yes, but the overall theme has to be the manifest weight of the evidence because it was live testimony. You asked, Your Honor, my co-counsel, about what was alleged in her application. And I would posit to you that she actually, by putting down vestibular ocular motor disorder, did allege what she got a disability award for, just not in the manner that you would think. It's the same as if someone who is schizophrenic were to put down depression. It is a symptom of the overall condition that she has. It is what she believes she suffers from. The vestibular ocular motor function was looked at in terms of her ability to move her eyes. She was looked at from a concussion standpoint. Some doctors say they believe she has post-consensual syndrome. Some doctors say they don't. But the point is that is a substantial and real symptom to her. That is part of the somatic disorder. That is actually why... My question is whether concussion is a prerequisite for the somatic disorder. It is not. It's in fact a... It could be. It could contribute because it's a head injury. But it's really... Somatic disorder is a trauma. It doesn't have to be a physical trauma. It can be an emotional trauma. And in this case, I believe the circumstances in her falling during a live fire, even if it's a practice, you saw some of the doctor's opinions in there where they said she's kind of... She's never been diagnosed with somatic disorder or somatoform disorder, depending on the doctors you're looking at, its opinions. It's not a preexisting condition. But she does have some personality traits. She's a little bit more anxious. She's a little bit more depressed than maybe the regular subset of the population. And in that case, she may be more likely to get it. But she doesn't have it before this accident. She believes that that dent in her helmet matters. But as your honors will notice, she's not here today. I did not give her the date and time, not because I don't want her to be aware. She was angry. Well, she'll be listening to the recording. Well, hopefully not. But she... I'm not going to tell her it's out there. She was angry. And I think, you know, my co-counsel could testify to that today. She was angry at the arguments I made at the trial court for her. Because she believes that everyone is out to get her. She thinks no one believes her. And she substantially feels these issues to be real. They are real to her. That is part of this disorder. And so when you're talking about all these different things, it is easy to... Because she doesn't think she has it. And she fills out that application. How do you fill out an application, you know, with something you don't believe you have? That would be like lying. Right? If your attorney tells you to fill out this application, you go, Well, I don't have that. I can't honestly put that down. That's part of the problem. She genuinely believes that she has these things. And that is part of this disorder. Somatic disorder is when you have a psychological condition, usually related to a trauma, sometimes related to a concussion, though not necessarily required. And it causes you to feel physical symptoms from your mental standpoint that cannot be corroborated by any physical test, which is the difficulty that all these doctors have. They all go and they keep testing her and they keep testing her and she's complaining. What is not hit in appellant's argument, but is in every single medical report, is that she's not malingering. This is not faking. She passes the embedded test for faking. She's not faking this disorder. Okay? She's not making up these physical symptoms. She genuinely believes that she has them. And she believes that she has them so much that Dr. Fletcher, who is an occupational health doctor, works for the defense and the plaintiff's side, who does these things all the time, who understands what disability is, and that it's more than just... Is he one of the independent medical examiners here? No, he was hired. But the point is... Are you talking about Fletcher? Fletcher, yeah. It is easy for us to say, oh, it's easy to fill out that paperwork. But doctors really take pride in whether or not they're going to be called back, especially if they do this for a living. And so he could have easily put unsure. He could have easily just not answered that question. He put his name on that line. He checked that she was disabled. And he came to testify for her because he genuinely believes her to be disabled. More than sick. More than she can get better. He believes that she cannot do the job that she did before. And we would not be having this conversation if she was diagnosed schizophrenic. It's the same kind of condition. It's coming from her mental status. But you cannot convince them that they have other personalities because they only live in the one. For her, you can't convince her that she doesn't have these physical symptoms because she has these physical symptoms. They are affecting her. They affect her ability to do her job. And we're not talking about a job in which she's writing paper. We're talking about a job in which she is required to go and put her life on the line and the lives of others on the line, including her co-workers, including the general public. She was an officer. She was a captain. She didn't get that job by being weak. She didn't get that job by being extremely... She might have been high-strung to begin with, but she used that ability to work her way up in the ranks. And that is working your way up in the ranks. Right. And then she gets down... She gets this trauma, and she... She can physically do everything. She just... That's why... Yang puts her through these tests, and he says, well, she's not disabled because he's putting her through a physical battle of tests. But it's here that matters. And it's here that she's going to be making life-and-death decisions. And that's why Dr. Fletcher says that she is disabled. Well, if I'm right, Fletcher, Dinwiddie, Brooke, Glantz, Mahoney all concluded that she was either disabled or unable to perform her duties, right? Correct. And then you've got Fletcher, Brooke, Mahoney, and Fitch all found that it was a result of the 2015 July incident. Correct. And then there was contrary evidence. There's contrary evidence, but it's not like this is unsupported in the record. The thing is, with regards to her condition, treatment, possible treatment, there is possible treatment. And most of the doctors said they thought she would improve, but that's not the question. That is a red herring as well. That's not the question. The question is whether or not she will improve sufficiently to regain the place she was before and go back to her full duties. Right. One quick question with regard to the standard of review. You know, we can't conflate different standards, but there's this mixture of so you can look at the documents, but still the overriding burden of, I mean, standard of review in this case is against the manifesto. Correct. Well, I mean, Your Honor, I assume you got here because you can read. So you are able to look at the documents yourselves and go, I read it to read this. I read it to look this way. And you can give that whatever way you want because you're looking at it anew with fresh eyes. You can read it. You can interpret it for yourselves. The reason that manifesto applies, and de novo might actually apply, if everything we had in this case was documentary in nature. But it isn't. And the trial court refused to substitute their judgment for the pension board. But the pension board listened to the live testimony of Dr. Fletcher and saw Angela Allen come in person and saw what she was doing and saw her mannerisms and said, that is consistent. Correct, Your Honor. Any further questions for me? Thank you, and I appreciate your time. Yes, ma'am. Thank you, Ms. Boncillo. Mr. Day, you're up. Thank you, Justice. I'd like to address several of the arguments raised by opposing counsel. First, regarding the period of 12 months and the statutory standard in that regard, I think it would be inequitable to state that an individual should be granted a line-of-duty disability pension for a condition that has lasted over 12 months if that applicant has refused treatment that is reasonable, necessary, safe, and offers a reasonable prospect of relief. So I would disagree with counsel's reading and interpretation and the pension board's interpretation of that particular section of the pension board here. I think it does not contemplate that the individual would be allowed to not pursue treatment during that 12-month period. Secondly, I would indicate that Ms. Allen has denied having those conditions. She refused treatment. At the pension hearing, she specifically said counseling had been offered throughout the course of her treatment. However, she did not need it. That can be found at page 4701, that she did not believe she had that condition and that treatment wasn't needed. She also told Dr. Jan Koska, her neurologist, after Dr. Nagel had recommended that treatment, that she did not need it, and that can be found on 2940 through 2941. Your references to the record just telling you is very helpful because we do listen to the recordings as other people may as well. It is really helpful that you take time to do that. I appreciate that. The third point I'd like to make is that the doctors that have been discussed in this case, there's clearly disagreement between the pension board and opposing counsel for Ms. Allen, Ms. Bonesteel, and myself as to the testimony of the doctors, which I would note the opinion of Dr. Kessler was not live. That's a record subject to de novo review. The six IME reports offered in this matter, again, documentary in nature. The only person to comment live at the hearing was Dr. Fletcher, the hired physician by Ms. Allen. I do not want to quote at length, but since a provision of Dr. Dinwiddie's opinion was referenced by the pension board's counsel, I would just like to note that his opinion, as I stated in pages 11 and 12 of my brief, him and Dr. Dinwiddie and Dr. Brooke clearly state that she questioned whether she had the conditions and had a reasonable nexus to her injuries, but also Dr. Dinwiddie specifically states it is more likely than not that the symptoms can be substantially improved. If she is able and willing to cooperate with treatment, a return to full and unrestricted duty is a reasonable prognosis. That meets the standard under MOLAC. He also stated that she had not received any psychiatric or psychological treatment, and that needed to be done. With regard to the other physicians, I would note that the references to Dr. Fitch's opinion, Dr. Fitch, with all respect to him, is an ophthalmologist. I think that the opinions of the neurologist and neuropsychologist should be given greater weight by this court, and should have been given greater weight. I'm not asking you to re-weigh any sort of non-documentary evidence, but I would submit that the conclusions reached by the pension board in that regard are against the manifest weight of the evidence. With regard to the ROSAC decision relied upon by the pension code, I would acknowledge that there is language in there that is correctly cited by the pension board's attorney. However, it affirmed the MOLAC decision and did not extend that decision. MOLAC is good law and should be applied by this case. There was a statement regarding there being no malingering in this case by Ms. Allen. However, Dr. Noggle and Dr. Kessler specifically discussed within their documentary reports that there were substantial evidence of malingering. Dr. Kessler's voluminous opinion in this case calls into question a variety of the malingering symptoms and the variety of actions by Ms. Allen. Again, regardless of the standard of review applied by this court, the City of Peoria would ask that the decision of the pension board be reversed. I feel that even if I understand there cannot be a combination of standards of review, but if the documents are reviewed under de novo standard and the totality of this case is reviewed under manifest weight, that standard of review exists for a reason. And in this case, the conclusions reached by the pension board are contrary to the manifest weight of the evidence. If there's any questions, I would be happy to address those at this time.